IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MIGUEL ANGEL SANDOVAL,<br><br>  Petitioner,<br><br>  v.<br><br>RON BARNES, Warden,<br><br>  Respondent. | No. C 12-3309 WHA (PR)<br><br>**ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS AND CERTIFICATE OF APPEALABILITY** |

## INTRODUCTION

Petitioner, a California prisoner, filed a *pro se* petition for a writ of habeas corpus under 28 U.S.C. 2254, seeking relief from his conviction in state court. Respondent was ordered to show cause why the writ should not be granted based upon petitioner's claims that: (1) his conviction and the gang enhancement were not supported by sufficient evidence; (2) he received ineffective assistance of counsel at trial; and (3) his right to due process was violated by the admission of evidence that he possessed screwdrivers. Respondent filed an answer with a supporting memorandum of points and authorities. Petitioner did not file a traverse. For the reasons set forth below, the petition is **DENIED**.

## STATEMENT

**I.  PROCEDURAL BACKGROUND**

In February 2009, a Santa Clara County Superior Court jury found petitioner guilty of second degree murder and found true the enhancements that petitioner committed the offense

1  for the benefit of a criminal street gang and that a principal personally discharged a firearm.
2  The trial court sentenced petitioner to a prison term of forty years to life.
3        On December 21, 2011, the California Court of Appeal affirmed petitioner's conviction
4  in an unpublished opinion (Exh. 8). On March 21, 2012, the California Supreme Court denied
5  review (Exh. 10). On June 27, 2012, petitioner timely filed the instant petition for a writ of
6  habeas corpus.

**II.   FACTUAL BACKGROUND**

The California Court of Appeal summarized the evidence pertaining to the offense as follows:

> In December 2006, the victim in this case, Robert Ojeda and his fiancée, Isabel Perez, went to Marina Foods shopping center in San Jose. Perez was driving the car, with Ojeda in the passenger's seat.
>
> . . .
>
> As they were driving in the parking lot, Ojeda said, "Stop the car." "That guy said my name." Perez stopped the car, and Ojeda got out.
>
> As Ojeda was standing by the car, Perez saw two Hispanic men approach him. The two men were later identified as Roberto Herrera and defendant. Herrera said to Ojeda, "Are you from the south side?" Ojeda said, "No, I'm from the east side." Herrera and Ojeda shook hands. Ojeda reached out to shake defendant's hand, and defendant did not take it. Ojeda said, "What's up? You're not going to shake my hand or what?" Herrera then put a small gun to Ojeda's head, shot and killed him.
>
> Herrera and defendant quickly walked away from Ojeda and got into a Cadillac Escalade that defendant had driven to the shopping center. Omar Ramirez–Solorio, who had been in the backseat on the drive to the shopping center, was now in the driver's seat, and drove Herrera and defendant away from the scene. Also in the car at the time was Florencio Escalante, who had been a victim of a gang-related shooting a week prior. Defendant was happy and laughing, and said, "Let's go get another," and "Let's celebrate."
>
> Defendant was a member of Logan 33rd, a Sureno gang from San Diego. Solorio and Herrera were members of Clanton, a Sureno gang. Escalante was a member of 18th Street, a Sureno gang.
>
> Surenos and Nortenos are rival Hispanic gangs that commit crimes ranging from assaults to robberies and murder. Each gang has its own subsets, and Clanton members are known to spend time with other Sureno gang members who are not Clanton. There was evidence of 10 prior offenses committed by Clanton members, including assault, auto theft and attempted murder.
>
> Surenos often call Nortenos "sodbusters," or "busters," because Nortenos were originally from farming towns. "[B]uster hunting," refers to Surenos looking for Norteno members to attack. Buster hunting includes deciding if a person is a member of a rival gang by looking at his clothing color, hairstyle and race, or asking him "[D]o you

bang?" or "Are you Southsider?"

The victim in this case, Ojeda, was a member of the Norteno gang. On the day of the shooting, Ojeda was wearing all black clothing, with K–Swiss shoes that had red stripes on them. "K–Swiss" has been known to mean "Kill Surenos when I see Surenos," and red is associated with the Norteno gang. The Marina Foods shopping center where the shooting happened is known as Norteno gang territory. Salvador Reyna, defendant's neighbor, heard defendant and Solorio talking about going buster hunting, saying they were "going to kick some buster's ass."

Exh. 6 at 1-2.

Petitioner's defense was that there was no plan to shoot anyone in the Marina Foods shopping center, that he and his companions went there to buy drugs and that petitioner was surprised when Herrera shot Ojeda (Reporter's Transcript ("RT") 2340-42, Defense closing argument).

## ANALYSIS

### I. Standard of Review

A district court may not grant a petition challenging a state conviction or sentence on the basis of a claim that was reviewed on the merits in state court unless the state court's adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. 2254(d). The first prong applies both to questions of law and to mixed questions of law and fact, *Williams (Terry) v. Taylor*, 529 U.S. 362, 407-09 (2000), while the second prong applies to decisions based on factual determinations, *Miller El v. Cockrell*, 537 U.S. 322, 340 (2003). Under 28 U.S.C. 2254(d)(2), a state court decision "based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state-court proceeding." *Id.*; *see also Torres v. Prunty*, 223 F.3d 1103, 1107 (9th Cir. 2000).

When there is no reasoned opinion from the highest state court to consider the petitioner's claims, the court looks to the last reasoned opinion from the state courts. *Ylst v. Nunnemaker*, 501 U.S. 797, 801-06 (1991). The last reasoned state court decision on

3

petitioner's claims is the decision by the California Court of Appeal on direct review (Exh. 8).

## II. ISSUES PRESENTED

### A. INSUFFICIENT EVIDENCE

Petitioner claims that there was insufficient evidence to support the jury's findings that he was guilty of murder and that the crime was committed for the benefit of a criminal street gang.

A federal court reviewing collaterally a state court conviction does not determine whether it is satisfied that the evidence established guilt beyond a reasonable doubt. *Payne v. Borg*, 982 F.2d 335, 338 (9th Cir. 1992). Nor does a federal habeas court in general question a jury's credibility determinations, which are entitled to near-total deference. *Jackson v. Virginia*, 443 U.S. 307, 326 (1979). If confronted by a record that supports conflicting inferences, a federal habeas court "must presume — even if it does not affirmatively appear in the record — that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution." *Id.* The federal court "determines only whether, 'after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *Payne*, 982 F.2d at 338 (quoting *Jackson*, 443 U.S. at 319). Only if no rational trier of fact could have found proof of guilt beyond a reasonable doubt, may the writ be granted. *See Jackson*, 443 U.S. at 324. The Supreme Court has recently emphasized that "*Jackson* claims face a high bar in federal habeas proceedings . . ." *Coleman v. Johnson*, 132 S. Ct. 2060, 2062 (2012) (per curiam).

Under AEDPA, a federal habeas court applies the standards of *Jackson* with an additional layer of deference. *Juan H. v. Allen*, 408 F.3d 1262, 1274 (9th Cir. 2005). Generally, a federal habeas court must ask whether the operative state court decision reflected an unreasonable application of *Jackson* to the facts of the case. *Coleman*, 132 S. Ct. at 2062; *Juan H.*, 408 F.3d at 1275 (quoting 28 U.S.C. 2254(d)). To grant relief, a federal habeas court must conclude that "the state court's determination that a rational jury could have found that there was sufficient evidence of guilt, i.e., that each required element was proven beyond a reasonable doubt, was objectively unreasonable." *Boyer v. Belleque*, 659 F.3d 957, 964-965

4

(9th Cir. 2011).

### 1. Murder Conviction

The Court of Appeal found there was sufficient evidence to support the conviction and rejected this claim.

> In this case, the prosecution proceeded against defendant on the murder charge on a theory of aiding and abetting Herrera in the commission of the crime, or conspiring with Herrera to commit the crime. Defendant asserts the evidence produced at trial was insufficient to establish his guilt under these theories.
>
> "All persons concerned in the commission of a crime, . . . whether they directly commit the act constituting the offense, or aid and abet in its commission, or, not being present, have advised and encouraged its commission, . . . are principals in any crime so committed." The rationale for finding the defendant guilty as an accomplice has been described as follows: "[W]hen an accomplice chooses to become a part of the criminal activity of another, she says in essence, your acts are my acts, and forfeits her personal identity. We euphemistically may impute the actions of the perpetrator to the accomplice by agency doctrine; in reality, we demand that she who chooses to aid in a crime forfeits her right to be treated as an individual. [Citation.]" (*People v. Prettyman* (1996) 14 Cal. 4th 248, 259.) To be found guilty as a principal of a crime the defendant did not personally commit, the prosecution must show that the "aider and abettor act[ed] with knowledge of the criminal purpose of the perpetrator and with an intent or purpose either of committing, or of encouraging or facilitating commission of, the offense. [Citations.]" (*People v. Beeman* (1984) 35 Cal. 3d 547, 560.) Factors the jury may consider when assessing aiding and abetting "include presence at the scene of the crime, companionship, and conduct before and after the crime, including flight." (*People v. Haynes* (1998) 61 Cal. App. 4th 1282, 1294.)
>
> A person may not be found guilty of a crime as an aider and abettor simply because he or she was present when the crime was committed or failed to take action to prevent it; those factors, however, are ones that a trier of fact may consider in assessing culpability. (*People v. Nguyen* (1993) 21 Cal. App. 4th 518, 529–530.) Similarly, a person's knowledge of another's criminal purpose is insufficient of itself to support aider and abettor culpability; the person "must also share that purpose or intend to commit, encourage, or facilitate the commission of the crime. [Citation.]" (*Id.* at p. 530.)
>
> Here, the prosecution produced ample evidence to support the theory that defendant aided and abetted Herrera in the commission of the crime. Specifically, defendant was a member of Logan 33rd, a subset of the Sureno gang. Herrera, the shooter, and Solorio, the getaway driver, were members of Clanton, a subset of the Sureno gang. Escalante, a passenger in the car with Herrera, was a member of 18th Street, a subset of the Sureno gang. Escalante had been shot in a gang-related incident that occurred on November 27, 2006, before the shooting in this case that occurred on December 3, 2006.
>
> Sureno and Norteno gangs are rivals. Both gangs have a culture of violence and commit crimes upon each other in retaliation for crimes or disrespect. Members of Clanton often participate with other Sureno gang members in criminal activity.
>
> On the day of the killing, defendant and Solorio were heard talking about going "buster hunting," or looking for Norteno gang members to attack. The Marina Foods shopping center was considered Norteno territory. When Herrera and defendant arrived at the Marina Foods shopping center, they walked around together for approximately 10 minutes without entering any stores. Defendant knew Herrera had a gun with him. The

5

  victim was wearing shoes with red stripes, and the color red is associated with the Norteno gang. Just before Herrera shot the victim, he asked him if he was from the south side, meaning Sureno, to which the victim responded that he was from the east side.

  After the shooting, Herrera and defendant went immediately back to their car where Solorio was waiting in the driver's seat with the car running ready to leave. When Solorio drove the car away from Marina Foods, defendant did not appear to be surprised or upset, saying "Let's go get another," and "Let's celebrate."

  The evidence at trial was sufficient to support defendant's conviction under a theory of aiding and abetting. Defendant was not only present at the scene, he acted with Herrera in surveying the parking lot for victims, knew Herrera had a gun with him, was heard talking about looking for Nortenos to attack, and showed no surprise after the shooting while fleeing from the scene. (*See, e.g., People v. Haynes*, 61 Cal. App. 4th at 1294.) Based on the evidence, the jury could reasonably conclude that defendant, Herrera, Solorio and Escalante, all members of the Sureno gang, went to a known Norteno gang territory looking for a Norteno victim in retaliation for the shooting of Escalante that occurred a week prior to the crime in this case.

  Viewing the whole record in a light most favorable to the prosecution, we conclude that a rational trier of fact could conclude that defendant aided and abetted Herrera in the shooting of the victim. There was sufficient evidence to support the murder conviction in this case.

Exh. 8 at 4-6.

  The state Court of Appeal's determination that the jury could find sufficient evidence of guilt based on the evidence presented was not objectively unreasonable. *See Boyer*, 659 F.3d at 964-965. Petitioner argues that the state court's determination was unreasonable because its conclusion that petitioner and Herrera went to known Norteno gang territory looking for a Norteno victim in retaliation for the shooting of Escalante was mere speculation. Petitioner argues that his case is similar to *Juan H. v. Allen*, 408 F. 2d 1262 (9th Cir. 2005), in which the Ninth Circuit found insufficient evidence to support the finding that Juan H. aided and abetted his brother in a murder and attempted murder. As discussed below, the cases are distinguishable.

  In *Juan H.*, Juan H., a minor, and his older brother were Surenos and their neighbors were Nortenos. At some time before the offense at issue, Juan H. had thrown gang-signs at his Norteno neighbor, who later punched him. When someone shot at Juan H.'s home, his brother confronted the neighbors about the shooting. When the neighbors denied shooting at his house, Juan H.'s brother shot them. During the time the brother confronted and then shot the neighbors, Juan H. stood behind his brother, did nothing during the shooting, then ran home and

6

1  denied being present when the shooting occurred. *Id.* at 1277.   The Ninth Circuit found this
2  evidence was insufficient to show that Juan H. aided and abetted his brother because "he did not
3  say or do anything before, during or after the shootings from which a reasonable factfinder
4  could infer an intent or purpose" to provide support or backup for his brother. *Id.* at 1278-79.
5  The fact that Juan H. ran home while his brother drove away in his car also supported a
6  conclusion of non-culpability. *Id.* at 1277.

7  In petitioner's case, although the evidence of his intent to participate in the shooting of
8  Ojeda was circumstantial, viewing it in the light most favorable to the prosecution, it was
9  sufficient for a reasonable jury to have found that petitioner had the knowledge and intent to aid
10  and abet Herrera in the shooting.  The evidence showed that petitioner and his three companions
11  in the car driving to the Marina Foods shopping center on December 3, 2006, were members of
12  subsets of the Sureno gang.  The following evidence was significant:  (1) Escalante, one of the
13  passengers in the car, had been shot in a gang-related incident a few days earlier; (2) earlier that
14  day, Solorio, another passenger in the car, and petitioner were overheard talking about looking
15  for Nortenos to attack; (3) the Marina Foods shopping center was considered to be Norteno
16  territory; and (4) petitioner knew that Herrera had a gun.

17  A video from surveillance cameras at the Marina Foods parking lot showed that, after
18  petitioner and his companions arrived at the Marina Foods shopping center, petitioner and
19  Herrera, the actual shooter, spent approximately ten minutes walking around together before the
20  crime occurred (RT 887).  During this time, petitioner and Herrera did not go into any stores
21  (RT 928).  The video showed that when petitioner and Herrera spotted the victim's car, they
22  looked at each other, and then moved toward the car (RT 925).  As petitioner and Herrera
23  moved toward the victim's vehicle, petitioner pulled up the hood of his jacket (RT 926).

24  Testimony showed that either petitioner or Herrera said something to Ojeda as the car
25  drove by which caused Ojeda to ask Perez to stop the car (RT 811-12).  When Ojeda got out of
26  the car, Herrera asked, "are you from the south side?" and Ojeda answered that he was from the
27  east side (RT 823).  Herrera and Ojeda then shook hands (RT 824).  Ojeda reached out to shake
28  petitioner's hand, but petitioner did not respond (RT 824).  Seconds later, Herrera shot Ojeda

7

(RT 824-25). The video showed that, immediately after the shooting, petitioner and Herrera together walked to their waiting car. (RT 826-27; 940-41). Solorio, who had been a passenger in the car, was in the driver's seat and had the car on and running when petitioner and Herrera jumped in (RT 1652). When petitioner got into the car, he jokingly said, "Let's get another one" and something like "Let's celebrate" (RT 1620-21; 1654).

The jury also heard the gang expert testify about the rivalry between the Surenos and Nortenos, the culture of violence, the commission of gang crimes for retaliation and the checklist that is called "profiling" or "checking" to determine the gang affiliation of an individual (RT 696-720). A large part of the gang expert's testimony about gang culture was confirmed by Solorio's testimony (RT 1635-36; 1670; 1737-39).

This evidence showed that: (1) petitioner, with Herrera, drove to a place known to be Norteno territory; (2) petitioner, with Herrera, walked around the shopping center apparently looking for a Norteno; (3) petitioner, with Herrera, spotted Ojeda and called him out of his car; and (4) after Herrera shot Ojeda, petitioner, together with Herrera, escaped to their waiting car. Even though circumstantial, the evidence of petitioner's conduct and presence at Herrera's side during the time leading up to the shooting, during the shooting and immediately afterward, viewed in the light most favorable to the prosecution, was more than sufficient to support the jury's finding that petitioner had the motive and intent to assist Herrera, a fellow gang member, in committing the offense in retaliation or as a show of Sureno gang power. The evidence in this case was much more incriminating than in *Juan H.*, where there was no evidence that Juan H. suspected the victims of shooting into his trailer, that he suspected his brother would shoot the victims or that he acted to support or encourage his brother to shoot the victims.

Based on the state court record, the Court of Appeal's determination that a rational jury could have found every element of the offense beyond a reasonable doubt was objectively reasonable. Habeas relief on this claim is denied.

**2. Gang Enhancement**

Petitioner argues that there was insufficient evidence to establish his specific intent to promote, further, or assist in any criminal conduct by gang members.

8

The elements of the gang enhancement are: "(1) the crimes charged were committed for the benefit of, at the direction of, or in association with a criminal street gang; and (2) these crimes were committed with the specific intent to promote, further, or assist in any criminal conduct by gang members." Cal. Penal Code § 186.22(b)(4) ("Participation in criminal street gang").

The Court of Appeal reasonably concluded that there was sufficient evidence to support the gang enhancement finding. Evidence was presented that showed that (1) all four occupants of the car driven to the Marina Foods shopping center were members of subsets of the Sureno criminal street gang; (2) the Surenos and Nortenos were rival Hispanic gangs that engaged in retaliating against those who confronted or assaulted one of their members; (3) the target of the retaliation did not have to be the person responsible for the prior assault; (4) the four gang members went to the Marina Foods shopping center, which was in Norteno territory, to look for a Norteno victim to attack either in retaliation for the shooting of Escalante that occurred the previous week or to display the strength of their gang.

From such evidence, a rational juror could find the elements of the enhancement true. The Court of Appeal's denial of this claim was objectively reasonable. Accordingly, this claim is denied.

### B. INEFFECTIVE ASSISTANCE OF COUNSEL

Petitioner argues that counsel rendered ineffective assistance because he did not object to the admission of the following evidence: (1) Officer Kevin Nishita's testimony of predicate offenses committed by gang members; (2) Officer Fernando Ramirez's testimony about the Logan gang in San Diego; and (3) Officer Nishita's testimony about the history, culture and psychology of the Sureno gang.

To prevail on a claim of ineffective assistance of counsel, a petitioner must show that (1) counsel's performance was deficient, and, (2) that he was prejudiced by counsel's deficient performance, i.e., that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland v. Washington*, 466 U.S. 668, 694 (1984). Under the first *Strickland* prong, a habeas petitioner must show that

9

1  defense counsel's performance fell below an "objective standard of reasonableness" under
2  prevailing professional norms, *id.* at 687–68, "not whether it deviated from best practices or
3  most common custom," *Harrington v. Richter*, 131 S.Ct. 770, 788 (2011) (citing *Strickland*, 466
4  U.S. at 650). "A court considering a claim of ineffective assistance must apply a "strong
5  presumption" that counsel's representation was within the "wide range" of reasonable
6  professional assistance." *Id.* at 787 (quoting *Strickland*, 466 U.S. at 689). As for the prejudice
7  prong, a reasonable probability is a probability sufficient to undermine confidence in the
8  outcome. *Id.* On habeas review, a state court's determination of no prejudice can be disturbed
9  only if that determination was objectively unreasonable. *Woodford v. Visciotti*, 537 U.S. 19,
10 26-27 (2002).

### 1. Predicate Offenses

Petitioner argues that defense counsel should have objected to the admission of eight of ten predicate offenses admitted into evidence through testimony of the gang expert because only two offenses were required to meet the prosecutor's burden of proving the gang enhancement. Petitioner argues that because many of the "unnecessary" eight predicate offenses were of violent assaults, they were prejudicial.

Testimony of gang experts that is probative of "a fact of consequence" and necessary to prove the prosecution's theory of the case is admissible. *Williams v. Adams*, 447 Fed. Appx. 829, 830-31 (9th Cir. 2011) (citing *Windham v. Merkle*, 163 F.3d 1092, 1103-04 (9th Cir. 1998). Highly probative gang-related evidence, although inflammatory, is not unduly prejudicial. *Id.* (citing *United States v. LeMay*, 260 F.3d 1016, 1026-27 (9th Cir. 2001) for proposition that introduction of probative evidence amounts to constitutional violation only if its prejudicial value far outweighs its probative value).

As explained by the Court of Appeal, the prosecutor had the burden of proving the gang enhancement beyond a reasonable doubt. California Penal Code section 186.22(f) defines a criminal street gang, in part, as an association of three or more persons "having as one of its primary activities the commission of one or more of the criminal acts enumerated" in section 186.22(e) and "whose members individually or collectively engage in or have engaged in a

10

1  pattern of criminal gang activity." Section 186.22(e) defines a "pattern of criminal gang
2  activity" as two or more of the qualifying offenses committed "on separate occasions, or by two
3  or more persons." Qualifying offenses include attempted murder, aggravated assault, robbery,
4  discharging a firearm from a vehicle and other violent crimes. Cal. Penal Code § 186.22(e).
5  Thus, to prove the gang enhancement beyond a reasonable doubt, the prosecutor had to
6  establish a pattern of criminal gang activity by showing the commission or attempted
7  commission of, or conviction for, two or more of the offenses enumerated in section 186.22(e)
8  committed on separate occasions by two or more persons.

9       At trial, gang expert Detective Nishita testified about ten predicate gang offenses listed
10  in section 186.22(e) (RT 1893-1936). None of the ten offenses involved petitioner. Because of
11  the prosecutor's burden of proof, testimony regarding predicate gang offenses was relevant and,
12  thus, was admissible.

13       Petitioner's argument that the offenses were unduly violent is meritless because, in order
14  for the prosecutor to meet his burden of proof, the offenses had to be one of those enumerated in
15  section 186.22(e), many of which involved violence. Because none of the offenses involved
16  petitioner, they did not portray him as being violent. Finally, Detective Nishita provided only
17  brief descriptions of each offense, with his testimony about the offenses covering only forty-one
18  pages of a trial transcript that is 2,398 pages in length.

19       Counsel's failure to object to Detective Nishita's testimony did not constitute deficient
20  performance. Because it was necessary for the prosecutor to present evidence of predicate
21  offenses to establish the gang enhancement, any objection would likely have been overruled.
22  Further, petitioner cannot show that he was prejudiced by the admission of this evidence. As
23  previously discussed, there was substantial evidence of petitioner and Herrera's involvement in
24  Sureno gangs and evidence that the killing of the victim was for the benefit of the Sureno gang
25  such that, even if eight of the ten predicate offenses had not been admitted, it is not reasonably
26  probable that the result of the trial would have been different.

27       The Court of Appeal rejected this claim finding that counsel's performance was not
28  deficient and that petitioner had not established prejudice. This determination was not

11

objectively unreasonable.

### 2. Testimony About Logan Gang

Petitioner argues that counsel should have objected to Detective Ramirez's testimony about the Logan gang in San Diego because the evidence was not relevant to the killing of Ojeda and was prejudicial.

Detective Ramirez testified as an expert in the Logan gang in San Diego (RT 1304-32). He specifically testified that petitioner's tattoos meant he was a member of Logan 33, a subset of the Sureno gang in San Diego (RT 1319-23). He also testified that the activities of the Logan gang were drug sales, theft, assault with a deadly weapon and attempted murder (RT 1345, 1347).

Detective Ramirez's testimony was relevant to the issues at petitioner's trial. Although the Logan gang was not alleged to have been directly involved in the shooting of Ojeda, the shooting was alleged to be an attack on a Norteno by Surenos. Detective Ramirez testified that the Logan gang was a subset of the Surenos. Evidence that petitioner was a member of the Logan gang was relevant to proving whether he had the intent, motive and knowledge to aid and abet Herrera in shooting Ojeda. Detective Ramirez's testimony about gang culture and violence was also probative of petitioner's motive and intent as a gang member and it countered petitioner's defense, that the shooting was not gang related and that he was a bystander who was surprised by Herrera's act of shooting Ojeda.

The Court of Appeal denied this claim on the ground that petitioner had failed to establish prejudice because any objection by defense counsel would have been overruled by the court due to the relevance of the evidence to the issues in the case. The state court's determination of no prejudice was not objectively unreasonable.

### 3. Testimony About Gang Culture

Petitioner argues that counsel was ineffective for not objecting to Detective Nishita's expert testimony about gang culture which, he claims, was irrelevant to the crime charged and prejudicial. Specifically, petitioner argues that counsel should have objected to the following testimony:

12

1  (1) Sureno gangs come from the Mexican Mafia, while Norteno gangs come from the Nuestra Familia; (2) violence is "glamorized" in gangs; (3) violence is used as discipline in gangs; (4) a person can commit a crime, or "crime in" to gain membership to a gang; (5) weapons are important to Surenos, and members almost always carry them; (6) gang members use items that have a legitimate purpose, such as screwdrivers as weapons; (7) gang members decide whether to arm themselves based on the color clothing they are wearing, and whether they will be entering an area where there is a possibility they will meet up with a rival gang member; (8) gang members do not want to be caught in a rival area without a weapon, (9) gang members earn their status in the gang by committing a crime; (10) fear and intimidation are used to gain respect within a gang; (11) respect within a gang is earned by responding to challenges; (12) gangs use the internet to communicate about crimes committed; and (13) gang life is focused on breaking the law.

Exh. 8 at 22-23.

As discussed above, to establish that petitioner was guilty of murder, the prosecutor had to prove beyond a reasonable doubt that petitioner aided and abetted Herrera in shooting Ojeda; to establish the gang participation enhancement under California Penal Code section 186.22(b)(1), the prosecutor had to prove beyond a reasonable doubt that petitioner committed the offense for the benefit of, at the direction of, or in association with a criminal street gang, with the specific intent to promote, further or assist in any criminal conduct by gang members.

Detective Nishita was qualified as an expert on gangs, gang culture, lifestyle, customs, habits and primary activities (RT 659, 662). Detective Nishita's testimony about the culture, habits and psychology of Hispanic gangs was useful to help the jury understand why a person would shoot a stranger in a shopping center parking lot, without any apparent motivation. The testimony about the history of the Sureno and Norteno gangs and their long-standing rivalry, about a gang's relationship to violence and weapons, a gang member's use of common tools as weapons and what certain words mean in the vocabulary of the gang were essential to helping the jury comprehend the prosecution's theory of what motivated petitioner to participate in the offense. These subjects were appropriate matters for testimony by a gang expert, such as Detective Nishita. Because the testimony was highly probative of facts in consequence, it was not unduly prejudicial and, therefore, was admissible. *See Williams*, 447 Fed. Appx. at 830-31 (highly probative gang-related evidence, although inflammatory, not unduly prejudicial). Counsel's performance was not deficient for failing to object.

The Court of Appeal denied this claim, determining that petitioner had not established

1    prejudice because, due to the relevance of the testimony, any objection that counsel made would
2    likely have been overruled. This determination was not objectively unreasonable. Also, given
3    the substantial evidence pointing to petitioner's guilt, there was no reasonable probability that,
4    had counsel objected and some of Detective Nishita's expert testimony had been excluded, the
5    result of the proceeding would have been different.
6    In summary, none of petitioner's grounds for ineffective assistance of counsel warrant
7    habeas relief.

### C.   ADMISSION OF EVIDENCE THAT PETITIONER POSSESSED SCREWDRIVERS

Petitioner argues that the trial court's admission of evidence that, in 2000, he possessed a sharpened screwdriver and that a sharpened screwdriver was found when his bedroom was searched in connection to the shooting of Ojeda violated his right to due process.

A state court's evidentiary ruling is not subject to federal habeas review unless the ruling violates federal law, either by infringing upon a specific federal constitutional or statutory provision or by depriving the defendant of the fair trial guaranteed by due process. *Pulley v. Harris*, 465 U.S. 37, 41 (1984); *Jammal v. Van de Kamp*, 926 F.2d 918, 919-20 (9th Cir. 1991). Failure to comply with state rules of evidence is neither a necessary nor a sufficient basis for granting federal habeas relief on due process grounds. *Henry v. Kernan*, 197 F.3d 1021, 1031 (9th Cir. 1999); *Jammal*, 926 F.2d at 919. The due process inquiry in federal habeas review is whether the admission of evidence was arbitrary or so prejudicial that it rendered the trial fundamentally unfair. *Walters v. Maass*, 45 F.3d 1355, 1357 (9th Cir. 1995). But only if there are no permissible inferences that the jury may draw from the evidence can its admission violate due process. *See Jammal*, 926 F.2d at 920.

Detective Ramirez testified that sharpened screwdrivers were carried by Logan gang members to defend themselves against violence from Norteno gang members. Based on the fact that the sharpened screwdriver petitioner possessed in 2000 and the screwdriver found in his bedroom were similar to the type of screwdriver described by Detective Ramirez, the Court of Appeal found the evidence relevant to demonstrate (1) petitioner's involvement in the Sureno gang; (2) petitioner's willingness to use violence against Nortenos; and (3) petitioner's intent in

14

approaching Ojeda in the Marina Foods parking lot (Exh. 8 at 10).

It was reasonable for the Court of Appeal to determine that evidence of the screwdrivers was relevant to show petitioner's association with the Sureno gang, the depth of his involvement in the gang lifestyle and his willingness to use violence against Norteno gang members. The fact that petitioner possessed the screwdrivers raised the reasonable inference that he had the intent and motive to assist Herrera in killing Ojeda, that he committed the crime for the benefit of a criminal street gang and that he had the intent to promote, further or assist in criminal conduct by gang members. Because there were many permissible inferences for the jury to draw from this evidence, its admission did not constitute a due process violation. *See Jammal*, 926 F.2d at 920 (no violation of due process from admission of evidence if there are any permissible inferences that the jury may draw from it). Accordingly, the claim is denied.

Petitioner's request for an evidentiary hearing, written in the caption of his complaint without any explanation, is denied. *See* 28 U.S.C. § 2254(e)(2).

## CONCLUSION

For the reasons described above, the petition for a writ of habeas corpus is **Denied**. A certificate of appealability will not issue. *See* 28 U.S.C. 2253(c). This is not a case in which "reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000).

The Clerk shall enter judgment in favor of respondent and close the file.

**IT IS SO ORDERED.**

Dated: November 8, 2013.

William Alsup
United States District Judge

G:\PRO-SE\WHA\HC.12\SANDOVAL3309.Dny.Rev1.wpd